**Shelby SHANKLIN, Jr., et al., Appellants,**

v.

**Jane W. TOWNSEND et al., Appellees.**

Court of Appeals of Kentucky.

March 22, 1968.

As Modified on Denial of Rehearing
Sept. 27, 1968.

Alvin B. Trigg, Joe C. Savage, Wallace, Turner & Trigg, Lexington, for appellants.

Joseph L. Arnold, Nolan Carter, Jr., Allen, Duncan, Duncan & Arnold, Lexington, for appellees.

DAVIS, Commissioner.

The appellant real estate brokers brought this suit to recover a commission from the appellees in connection with certain transactions pertaining to real estate owned by appellees and listed for sale by them through appellants. The trial court used an advisory jury which answered an interrogatory upon which the judge found for the appellees and against appellants.

The real estate involved in the transactions is a tract of about 62 acres in Fayette County. The appellees, owners of the land, are four sisters, Jane Townsend, Lucy T. Reeves, Laura Toleman, and Martha Moore, to whom we shall refer by their Christian names. Appellants Shanklin and Clark are real estate brokers doing business as Clark and Shanklin, Realtors. Appellant Lutes is a realtor and proprietor of an interior decorating concern. In 1959 when the four sisters acquired title to the land by inheritance, Jane had been employed by Lutes in his interior decorating business for five or six years. Lucy also worked for Lutes in the interior decorating

shop and later as a saleslady in his real estate operations from about 1959 until 1962, when she ceased her employment with Lutes and became employed as a saleslady in real estate for Shanklin and Clark.

The four appellees, with the husbands of the married ones, entered into a listing contract whereby appellants were employed as brokers with authority to undertake the sale of the tract at a price of $11,500 per acre. The listing contract provided that it was to be valid for one year or until industrial zoning could be obtained for the land. It provided also that if the property was sold before its expiration the standard real estate commission prescribed by the Lexington Real Estate Board should be paid irrespective of by whom the sale was effectuated. According to the complaint, the applicable commission was 5% of the sales price.

There is a conflict in the evidence concerning the details surrounding the drafting of the contract. However, it was prepared by Shanklin at his office on March 17, 1964, and was there signed by all the sisters except Martha, who later received and signed it in Arizona.

On October 13, 1964, the four sisters entered into an agreement with Hannah-Gardner Oldsmobile, Inc., giving it an option to purchase the land at $10,100 per acre. The option provided that upon its exercise the sum of $20,000 would be paid with the notice of acceptance and would be applied on the purchase price. It further provided that if the sellers were unable to convey title the $20,000 would be refunded, but "should second party fail to carry out its obligations hereunder for any reason other than failure of first parties to convey said title, the said $20,000 shall be retained by first parties as liquidated damages." Another provision of the agreement noted that any real estate commission due upon any listing of the property by sellers would be paid by sellers.

On October 29, 1964, Hannah-Gardner elected to exercise the option and paid the

$20,000, but for reasons not pertinent to our decision Hannah-Gardner did not complete the purchase, and the $20,000 was retained by the appellees. It is not suggested that the appellants procured Hannah-Gardner as a purchaser, nor is it denied that the option agreement was consummated within the one year provided in the listing contract and prior to any re-zoning.

Appellants contend that upon Hannah-Gardner's election to exercise its option the property was "sold" and that they are entitled as a matter of law to a judgment for the full amount of the commission called for in the agency contract, which they calculate to be $31,310.

■ A real estate broker may earn his commission "either by producing a person who is not only then, but at all times, ready, able, and willing to purchase the property on the prescribed terms, *or by obtaining from the customer a binding contract* which the landowner himself may enforce, in case of a breach or default in its terms." (Emphasis added.) Casey v. Hart Wallace & Co., 188 Ky. 441, 222 S.W. 111, 112; Ferguson v. Harris, 200 Ky. 146, 254 S.W. 329, 332. In such cases the word "sale" is not construed as requiring consummation of the transaction. T. W. Sandford & Co. v. Waring, 201 Ky. 169, 256 S.W. 9, 10; Odem Realty Co. v. Dyer, 242 Ky. 58, 45 S.W.2d 838. "The reason for the rule is that the owner is not bound to accept the purchaser until he has been given an opportunity to satisfy himself as to the purchaser's financial responsibility." Swinebroad v. Foster, 196 Ky. 459, 244 S.W. 881, 882. In the case now before us the brokers did not procure the prospective buyer, but the brokerage contract having provided that the commission would be payable if the property was sold either with or without the services of the brokers, we think the word "sold" must be given the same meaning in the one event as it would have been given

in the other. That is to say, since a binding sales contract with a purchaser produced by the brokers would have been a "sale," a binding sales contract with a purchaser obtained by the owners independently of the brokers also must be regarded as a "sale."

There do not seem to be many reported cases dealing with the precise question of what constitutes a sale to a purchaser obtained by the owner independently of an agent to whom he has given the privilege (exclusive or otherwise) of selling the property. In Story v. Gibbs, Ky., 309 S.W. 2d 334, on which the appellant brokers lay considerable emphasis, the broker procured the buyer, and the contract thereafter entered into by the parties contained an unconditional promise by the seller to pay the broker a commission of $880 "for services rendered in this transaction."[1] The facts of that case are not sufficiently analogous to help in this one. However, a reasonable degree of enlightenment may be found in two decisions holding that the owner's independent transaction did *not* amount to a sale.

In Lewis v. Dahl, 108 Utah 486, 161 P.2d 362, 160 A.L.R. 1040, and Hartig v. Schrader, 190 Ky. 511, 227 S.W. 815, oral commitments made by the owners were held not to constitute sales. In the Utah case it was said that the word "sale" as used in such a contract "means payment of the purchase price and the conveyance of title *or the execution of a binding contract of sale * * *.*" (Emphasis added.) 161 P.2d at page 365, 160 A.L.R. at page 1044.

In Hartig, a broker with whom property had been listed produced a good buyer after the owner had made an oral agreement to sell to someone else. In passing to its conclusion that the oral commitment was *not* a sale (hence the broker was entitled to his commission), this court said: "The sale of land in this state means either the execution

1. Thus connoting acceptance of the services as completed. The sellers' agreement in the instant case to pay "any real estate commission due upon any listing of the property" did not, it seems to us, import a recognition that any commission actually was payable.

and delivery of a conveyance therefor * * *or entering into a binding, written contract* which may be enforced in the courts." (Emphasis added.) 227 S.W. at page 817.

In each of the two opinions just mentioned the court determined what was *not* a sale by the process of defining what *was* a sale, and they support our conclusion that a binding contract of purchase and sale procured entirely through the owner's efforts is a sale, cutting the broker off if his agency is nonexclusive but entitling him to a commission if he has been given an exclusive privilege to sell the property.

Should there remain a lingering doubt as to whether the word "sale" in this case was intended to mean a completed transaction, surely it must be erased by the following provision of the agency contract itself: "In the event of such sale, I will execute and deliver to such purchaser a deed * * *."

It is contended, however, that the $20,000 liquidated damages provision reduces the contract to something short of a sale, because the purchaser could elect not to take the property and get out for $20,000. Without opening the troublesome subject of whether a provision for liquidated damages is exclusive, precluding specific performance or further damages, we are of the opinion that in any event the contract with Hannah-Gardner was a binding contract of purchase and sale. A purchaser can always elect to breach the contract and subject himself to whatever relief the seller is able to enforce, whether it be liquidated or not. That the damages may have been stipulated in advance should not effect a difference in principle. That which is unliquidated requires only the process of negotiation or litigation to become liquidated.

"A contract for the sale of real estate by the terms of which a stipulated sum is fixed as the estimated amount of damages that will result to either of the parties by reason of the other's breach thereof, which the party not breaching is either expressly or impliedly bound to accept in satisfaction of the obligation of the proposed purchase or sale, is nevertheless a contract of sale rather than an option." Annotation, "Instrument for purchase of land as a contract or an option," 87 A.L.R. 563, 566, citing Karr v. Stevens, Tex.Civ.App., 297 S.W. 287, aff'd 119 Tex. 479, 33 S.W.2d 725.

In Carter v. Hall, 191 Ky. 75, 229 S.W. 132, the measure of damages in an instance where the owner breached an "exclusive privilege" contract with a broker by selling the land himself was held to be the full amount of the commission stipulated in the contract. To the same effect, see Murphy v. Sawyer & Warford, 152 Ky. 645, 153 S.W. 991. In the instant case there was no breach of the brokerage contract, and the suit is not for damages resulting from a breach of contract but for compensation due under the terms of the contract. Nevertheless, it seems abundantly clear from the authorities heretofore mentioned in this opinion that if this were a case in which the brokers had procured the purchaser they would be entitled to a commission based on the full amount of the purchase price agreed upon by the owners and the person to whom they contracted to sell the property, unless the agency contract be construed to intend that the commission be paid out of the proceeds *actually realized or obtainable.* We therefore come to these questions: (1) Is there any reason for a different result when the purchaser has been obtained through the owner's independent efforts? (2) Can the contract be fairly construed to make the commission contingent on the receipt of sufficient proceeds by the seller from the buyer to pay it? To answer either of these questions in the affirmative would repudiate the reasoning by which we have been forced to the conclusion that the word "sale" does not connote a completed transaction and that the brokers' entitlement to the stipulated commission is not defeated by a failure of the buyer or seller to consummate his contract. There are instances in which agency contracts have provided expressly for payment of the commission

out of the proceeds,[2] but we have not unearthed any authority to support a conclusion that such a condition is implied in the ordinary agency contract that is silent on the subject.

■ It may at first blush seem harsh that a *seller who recovers from a defaulting* buyer less than the amount of the broker's commission must nevertheless pay the commission, especially when the broker did not procure the buyer in the first place. On the other hand, when the seller has contracted to pay the commission regardless of who finds the buyer, the seller makes the broker a real party in interest to any contract of sale he desires to make and has the means at hand to protect himself by bringing the broker into the transaction at the time the sales contract is made. In this case, for instance, knowing they had a binding commitment to pay the brokers 5% of the sale price, the sellers were ill-advised to limit their protection by a provision for liquidated damages of only $20,000 without securing an agreement from the brokers to accept that sum in satisfaction of their interest in the event of a default. In a sense, the brokers were 5% owners, and they simply did not consent to being sold out for $20,000.

During the trial an issue not theretofore pleaded developed as to whether the listing contract, and especially that portion by which the commission was made payable even if the property should be sold by the owners without the help of the brokers, had been procured through fraud. On motion the appellees were permitted to amend their answer so as to present that issue formally. They defended also on the further ground that in any event the brokers had failed to make reasonably diligent efforts to sell the land during the period covered by the listing agreement. These focal points of the extended trial are pointed up by consideration of the only two interrogatories submitted by the trial court, which we quote:

> Interrogatory Number 1—"Was an agreement between the Plaintiff, Shelby Shanklin, and the defendant, Jane Townsend, before the defendants signed the uncompleted listing agreement, that when this agreement was completed, it would provide, among other things, that if the defendant sellers themselves procured a purchaser for the land, then in that event the defendant sellers would not be obligated to pay Plaintiffs a broker's commission?"

> Interrogatory Number 2—"Did the Plaintiff brokers make reasonably diligent efforts to sell the land during the period covered by the listing agreement?"

■ The jury responded "yes" to Interrogatory Number 1 and, as instructed, made no answer to Interrogatory Number 2 since the answer to the first inquiry was dispositive of the case.

The appellants insist that they were entitled to a directed verdict. They urge now that the court should have sustained their motion for a judgment n. o. v. We agree with the contentions of the appellants and shall relate the bases of our decision.

Of the four sisters who signed the listing contract, only Jane testified that there was an agreement that the completed contract would provide that no commission should be payable if the sellers themselves procured a purchaser. In a pretrial deposition, the listing contract was exhibited to Jane, and she was specifically asked whether the contract, as signed, conformed to the understanding of what it would contain when finally drafted. She deposed as follows:

> "Q.202. Look carefully and see if you find anything in the contract that does not cohere with everything you signed.

2. See *Restatement of Agency* 2d § 445, Comment *e*; 12 Am.Jur.2d 938 (Brokers, § 196); Denney v. Hogue, 265 Ky. 30, 95 S.W.2d 1124, 1125; Odem Realty Co. v. Dyer, 242 Ky. 58, 45 S.W.2d 838, 840, and cases therein cited.

A. It does on the multiple form I signed.

Q.203. Aside from the form is there any term in there that you didn't agree on in the office?

A. No.

Q.204. Then this agreement as drawn and typed and that you have examined now was properly drawn in accordance with the agreement you all reached in the office, was it not?

A. Yes, except the time."

Appellants assert that Jane's testimony under oath in her pretrial deposition constituted a "judicial admission" foreclosing her assertion when testifying at the trial that there was an understanding that the contract would provide for no commission if the owners procured the buyer. Appellants rely on Sutherland v. Davis, 286 Ky. 743, 151 S.W.2d 1021, Schoenbaechler v. Louisville Taxicab and Transfer Co., Ky., 328 S.W.2d 514, and the cases discussed in those opinions for the proposition that the testimony of Jane was a fatal judicial admission unless probability of error in her testimony was satisfactorily shown. In Halbert v. Lange, 313 Ky. 648, 233 S.W.2d 278, it was recognized that the conclusiveness of a judicial admission may be destroyed "if and when the party corrects his statements, explains them, or introduces other testimony showing that he could have been mistaken as to the facts." Id. 233 S.W.2d 280. But the attending circumstances which prevailed in Halbert are not present here. As noted, only Jane undertook to assert that there was any failure to include in the final draft of the listing agreement the clause denying commission if the land were sold by the owners. When she gave her pretrial deposition, Jane was questioned extensively in the presence of her own counsel and was afforded full opportunity to relate the claim that the contract was not as agreed upon. She made a detailed statement that the contract was properly drawn in accordance with the agreement, except as to the duration of the listing. In her testimony at trial, Jane suggested that opposing counsel had harassed her and that she was confused. During the course of her testimony upon the trial, she charged that the same opposing counsel was again harassing her, although the trial judge observed that such was not the case. The deposition she gave and the account of her testimony at the trial do not reflect that she was harassed or otherwise subjected to treatment which would produce confusion or lack of recollection. It is significant that there was no pleading in behalf of the appellees asserting fraud until all of the evidence had been completed and long after Jane's pretrial deposition had been transcribed. In these circumstances we are persuaded that the rationale of Sutherland v. Davis, 286 Ky. 743, 151 S.W.2d 1021; Schoenbaechler v. Louisville Taxicab and Transfer Co., Ky., 328 S.W.2d 514, and the cases discussed in them governs this case. It follows that the only party who undertook to testify to facts supporting the first interrogatory had judicially admitted facts refuting any basis for that interrogatory. Hence, it was improper to submit Interrogatory Number 1 to the jury.

■ As to the question presented by the second interrogatory and unanswered by the jury, the evidence is overwhelming in support of the proposition that the brokers did make diligent efforts to sell the property during the pertinent period. The brokers testified concerning their activities, and there was no direct evidence to the contrary. There was negative testimony adverse to the proposition that the brokers had been diligent, but it was not of the probative quality to support a finding against the appellants. It is significant that Jane and Lucy remained in the employment of the appellants during all of the time between the signing of the listing contract and the granting of the option, (as well as later) but neither of them made any protest as to the manner in which the brokers were proceeding. Indeed, there is nothing to suggest that the brokers were ever challenged or prodded to expend greater efforts, and all persons seemed to recognize

that a favorable zoning ruling would have to precede a final sale of the property at the demanded price. We conclude that there was no submissible issue on the question of the brokers' diligence. Appellees cite 12 C.J.S. Brokers § 65, pages 149, 150; Mattingly-Lusky Realty Company v. Camper, 228 Ky. 407, 15 S.W.2d 240; and Merten v. Vogt, 306 Ky. 574, 208 S.W.2d 739, touching the question of lack of diligence or abandonment of the agency's agreement. We have no quarrel with those decisions, nor with the text authority cited, but find that the facts in the present case make them inapplicable here. It follows that there was no issue on the question of diligence.

The judgment is reversed with directions to enter a new judgment in favor of the appellants in accordance with the prayer of the complaint.

MONTGOMERY, C. J., and HILL, MILLIKEN, PALMORE, STEINFELD, and WILLIAMS, JJ., concur.

OSBORNE, J., dissents.

By OSBORNE, Judge (dissenting).

This case presents a novel question and, as pointed out in the majority opinion, there are no reported cases directly upon the point. Therefore, it behooves this court to carefully examine the principles being applied and the logic behind those principles.

As an initial proposition it is understood by all who deal in real estate agency transactions that all agency contracts contain a provision for the payment of the agency fee in the event of a sale by the owner during the life of the contract. Courts have uniformly enforced this provision, and justly so, because reason and logic compel such a result. If the law were otherwise, it would be very easy for the prospective buyer to contact the owner, consummate the transaction and defeat the agency's fee after the agency had worked up the sale. A necessary evil of this rule is that many times agents do not attempt to sell the property and make no effort toward this end. The owner on his own initiative procures a buyer, makes the sale and still must pay the agent's fee. This is acknowledged to be unjust but the rule has prevailed in order to protect the agency against the owner who would cheat it out of its fee otherwise. Another rule that has been uniformly enforced is one that requires the owner to pay the agency fee if the agency produces a buyer during the life of the contract and the owner refuses to sell. This is a perfectly logical rule as it gives consideration to the fact that the agency has done its work and the seller should pay for the right to change his mind.

In the instant case the agency did not produce the buyer and can not lay moral or legal claim to the fee upon this ground. The owner procured the buyer without the assistance of the agency and according to the testimony even with their discouragement. The contract for the sale was entered into in good faith by both the buyer and the seller but was not consummated because of the inability of the buyer to carry out the contract and not because of a change of mind by the seller. Therefore, there was no ultimate sale. The agency at no time produced a buyer and has not shown that it could have done so in any event. I can find no moral or legal justification for permitting the agency to recover a fee in this case. To do so is to convert a rule that was originally intended as a shield for the agent into a sword and to give him the right to flail away at the carcass of the poor seller without end.

In my judgment, the majority opinion is totally unsound and establishes a bad precedent for it allows the derelict agency to recover the full fee for work not performed in a case where no sale actually resulted. It does not serve to protect the honest agent against the unscrupulous seller as was the purpose of the original rule.

It is one thing to say the agent is entitled to collect his fee when he presents a buyer and a binding contract of sale is entered into with terms of payment acceptable to the seller. It is quite another to say the agent is entitled to collect a fee when the seller on his own procures the buyer and enters into a contract which must be aborted before being finalized and before the seller has received payment in cash or negotiable paper. The two situations simply are not analogous and authorities cited in support of one are not authority for the other.

For the foregoing reasons, I respectfully dissent.